UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

DONIA GOINES,

      Plaintiff,

v.

Case No: 2:17-CV-00656-JES-CM

LEE MEMORIAL HEALTH SYSTEM
d/b/a CAPE CORAL HOSPITAL;
and JEOVANNI HECHAVARRIA, RN,

      Defendants.
_____/

## DECLARATION OF FRED HYDE, M.D.

1. My name is Fred Hyde. For the past 40 years I have been a hospital executive, a professor of hospital management, and an independent consultant specializing in hospital and health services. My resume is attached to his declaration as **Exhibit "A"**.

2. I was retained by the Plaintiff to provide expert opinions in this case related to LEE MEMORIAL HEALTH SYSTEM management, policies, procedures, oversight, and adherence to hospital standards and norms, in regards to LEE MEMORIAL HEALTH SYSTEM's investigation, response and actions involving the JEOVANNI HECHAVARRIA sexual assaults, which took place between March 2015 and July 2016.

3. I was deposed by the Defendant on September 20, 2018. However, after my deposition, I was provided with approximately 2,200 pages of sexual assault investigative materials for the five (5) years preceding the sexual assaults at issue in this case.[1]

4. I have since reviewed and analyzed all records and documents produced by LEE MEMORIAL HEALTH SYSTEM involving the investigations of prior sexual assaults against patients.

---

[1] The aforementioned records were not produced to the Plaintiff by the Defendant prior to the time of my deposition.

5. Including the Brianna Hammer assault and the DONIA GOINES' rape, there were sixteen (16) sexual assault incidents that have been identified by the Defendant since 2012.

6. As you will see in my Declaration and my summary of past sexual assault documents, it is my opinion that LEE MEMORIAL HEALTH SYSTEM had a deliberate indifference to the rights and safety of patients with regard to being sexually assaulted by hospital staff.

7. Based upon my review, as well as my experience, education, background, and training, LEE MEMORIAL HEALTH SYSTEM failed to protect the safety and well-being of its patients, routinely failed to adhere to its own policies and procedures, and routinely showed a systemic policy and culture of disbelieving patients when they articulated allegations that a health-care provider sexual assaulted them. LEE MEMORIAL HEALTH SYSTEM's deliberate indifference to the rights and safety of its patients allowed for future sexual assaults to occur and created an environment where employees committing acts of sexual assault felt protected from punishment.

8. In each and every sexual assault allegation produced to the Plaintiff, Defendant LEE MEMORIAL HEALTH SYSTEM failed to conduct a Root Cause Analysis (RCA). (*See* Past Sexual Assault Investigation Summary, attached hereto as **Exhibit "B"**). A sexual assault allegation is deemed a "Never Event" or "Sentinel Event" by the organizations that accredit hospitals. A thorough investigation or Root Cause Analysis is required for each and every "Sentinel Event."

9. The accreditation standards promulgated by The Joint Commission and by *Det Norske Veritas* (DNV) are based upon the Conditions of Participation (CoP) for Hospitals, published by the Centers for Medicare and Medicaid Services (CMS), part of the U.S. Department

of Health & Human Services. The Conditions of Participation were contained in the legislation authorizing the creation of the Medicare program, in 1965, and have been updated regularly since that time. Accreditation organizations contract with the Centers for Medicare and Medicaid Services to show that hospitals meeting their accreditation standards will be deemed to be in compliance with the Conditions of Participation. Failure to meet the requirements of the Conditions of Participation will make any hospital ineligible to be paid for services by Medicare, Medicaid, and almost all commercial health insurance plans.

10. I include reference below to both *Det Norske Veritas* (which has accredited LEE MEMORIAL HEALTH SYSTEM since 2011) and The Joint Commission (which formerly accredited LEE MEMORIAL HEALTH SYSTEM) for three (3) reasons. First, the "standard of care" for management of a hospital would include reference to statute, regulation, accreditation and professional guidelines, at a minimum. Second, DNV accredits less than ten (10%) percent of U.S. hospitals; The Joint Commission accredits approximately ninety (90%) percent. Third, the authority of both The Joint Commission and DNV stem from the same source, namely their contracts with CMS to demonstrate the compliance of accredited hospitals with the Conditions of Participation.

11. The Joint Commission defines Sentinel Event as "A patient safety event (not primarily related to the natural course of the patient's illness or underlying condition) that reaches a patient and results in death, permanent harm, or severe temporary harm. Sentinel Events are a subcategory of adverse events."[2]

12. *Det Norske Veritas* defines a Sentinel Event as "an unexpected occurrence or variation that led to death or serious physical or psychological harm. This definition includes

---

[2] The Joint Commission Hospital Accreditation Standards, 2016

'never or adverse events' that are errors in medical care that are clearly identifiable, preventable and serious in their consequences for patients."[3] Neither The Joint Commission nor *Det Norske Veritas* themselves conduct investigations of sexual assault or any other "Never" or "Sentinel Event." Rather, they set standards for hospitals to use in conducting such investigations, which standards have been routinely violated by LEE MEMORIAL HEALTH SYSTEM, for example, in reporting the results of an investigation (as in the case of Brianna Hammer) prior to the completion of the in-house "investigation."

13. The term "Never Event" was introduced by the National Quality Forum in 2001 and refers to "adverse events that are unambiguous (clearly identifiable and measurable), serious (resulting in death or significant disability), and usually preventable."[4] The 29 "serious reportable events" are grouped into seven (7) categories, one of which is "Criminal events." Under this category is the specific "Never Event" of "Sexual abuse/assault on a patient within or on the grounds of a health care setting."[5] These events are termed "Never" because, notwithstanding the volume of patients seen by a hospital, the events should "never" occur.

14. Both The Joint Commission and *Det Norske Veritas* standards require that hospitals ensure the safety of patients in their care.[6] This is based upon the Conditions of Participation, which indicate that "The patient has the right to receive care in a safe setting" and "The patient has the right to be free from all forms of abuse or harassment."[7] This protection of patient safety is achieved through quality and risk management activities, which include a thorough investigation of adverse, Sentinel and Never Events, as well as proactive risk mitigation.

---

[3] DNV Standard, Interpretive Guidelines and Surveyor Guidance for Hospitals, November 2013, Version 3.1
[4] AHRQ Patient Safety Network Patient Safety Primer "Never Events," Updated to August 2018
[5] *Ibid.*
[6] DNV Standard, Interpretive Guidelines and Surveyor Guidance for Hospitals, November 2013, Version 3.1, Section 10, Patient Centered Care; Hospital Accreditation Standards, Standard LD.03.01.01, The Joint Commission, 2013
[7] Conditions of Participation for Hospitals, §482.13, Patient Rights, January 3, 2012

15.     The Joint Commission adopted a formal Sentinel Event Policy in 1996[8]. This is described as including "a timely, thorough, and credible comprehensive systematic analysis; developing an action plan designed to implement improvements to reduce risk; implementing the improvements; and monitoring the effectiveness of those improvements."[9] Root Cause Analysis is a "structured method used to analyze serious adverse events" and "one of the most widely used approaches to improving patient safety."[10] In fact, according to The Joint Commission, "RCA is the most commonly used form of comprehensive systematic analysis used by Joint Commission-accredited organizations to comply with this [Sentinel Event] requirement."[11] The goal of RCA, according to The Joint Commission, is "to produce an *action plan* that identifies the strategies the organization intends to implement to reduce the risk of similar events occurring in the future."[12]

16.     *Det Norske Veritas* standards call for a Quality Management System which "shall ensure that corrective and preventive actions taken by the hospital are implemented, measured and monitored" and that "adequate resources are allocated for measuring, assessing, improving, and sustaining the hospital's performance and reducing risk to patients." DNV Surveyor Guidance specifically references "Nonconformity Reports, Root Cause Analysis, and corrective action plans/actions" as methods through which the organization can demonstrate processes, which identify, address and document actions which "have been effective and sustained."[13] With regard to both adverse and Sentinel Events, DNV's Interpretive Guidelines indicate to surveyors that "The

---

[8] "Sentinel Event Policies and Procedures," The Joint Commission, June 29, 2017.
[9] "Root Cause Analysis in Health Care: Tools and Techniques, The Joint Commission, 2015.
[10] AHRQ Patient Safety Network Patient Safety Primer "Root Cause Analysis," Updated to August 2018.
[11] "Root Cause Analysis in Health Care: Tools and Techniques, The Joint Commission, 2015.
[12] "Root Cause Analysis in Health Care: Tools and Techniques, The Joint Commission, 2015.
[13] DNV Standard, Interpretive Guidelines and Surveyor Guidance for Hospitals, November 2013, Version 3.1, Section 3, Quality Management System.

organization should have collected and analyzed data…to demonstrate that these processes are closely monitored."[14]

17. In addition to Quality Management standards, DNV addresses the protection of patients in Section 4, "Safety Risk Management." These standards require that accredited hospitals "ensure that a risk management system is established that addresses patient safety as well as other safety risks that may impact on patients, staff or other visitors to the hospital." Notably, for these cases, the standards also specify that its approach to risk assessment "is proactive rather than reactive."[15] The Joint Commission echoes this sentiment, writing that "Health care organizations no longer have to wait until after a Sentinel Event occurs to perform a root cause analysis."[16]

18. DNV's standards related to Safety Risk Management are extensive and address risk assessment, management, and reporting. Among the requirements are that the hospital must have "documented procedures to define, record, analyze and learn from incidents that impact safety. This shall include medical errors and adverse patient events." In addition to "suitable methodologies for assessing and recording risks," DNV calls for management staff to monitor "the effectiveness of the controls being applied to reduce or eliminate the hazards identified in the risk assessment process."[17]

19. There is no evidence that LEE MEMORIAL HEALTH SYSTEM met the standards of investigation, corrective action, monitoring and documentation put forth by DNV or The Joint Commission in response to the 16 allegations of sexual assault. As one example, LEE MEMORIAL HEALTH SYSTEM reported to Florida's Agency for Health Care Administration

---

[14] *Ibid.*
[15] DNV Standard, Interpretive Guidelines and Surveyor Guidance for Hospitals, November 2013, Version 3.1, Section 4, Safety Risk Management.
[16] "Root Cause Analysis in Health Care: Tools and Techniques," The Joint Commission, 2015.
[17] Op cit.

(AHCA), less than 24 hours after an allegation, that they had conducted an investigation and found no evidence to support the patient's claims, yet the accused had not been interviewed by the detective, and they (LMHS) had not interviewed the accused's colleagues. To meet the standards of DNV or The Joint Commission, an investigation must be thorough and credible. In multiple instances, it appears that the goal of the organization was not to reduce risk to patients but to exonerate its employees and thereby protect the institution. This is further evidenced by LEE MEMORIAL HEALTH SYSTEM's failure to provide AHCA with full and accurate information when reporting adverse incidents, including multiple prior accusations against an accused employee. The full exhibit of my notes from an examination of these cases will be found as **Exhibit "B"** to this Declaration.

20. In addition to inadequate investigations of Sentinel Events, LEE MEMORIAL HEALTH SYSTEM failed to meet the standard of proactively mitigating risk to patients. Transferring high-risk employees to the day shift, for example, or assigning a male nurse only male patients, were missed opportunities for the organization to actively protect its patients.

21. The defensive, rather than proactive, nature of LEE MEMORIAL HEALTH SYSTEM's responses to allegations of sexual abuse or assault by staff is further illustrated by the numerous times the organization cites the patient's desire not to pursue his or her accusations as support for LEE MEMORIAL HEALTH SYSTEM's inaction. This would appear to be in direct contradiction to *Florida's Statutes* regarding Hospital Licensing and Regulation, § 395.1046, complaint investigation procedures: "The agency may investigate, or continue to investigate, and may take appropriate final action on a complaint, even though the original complainant withdraws his or her complaint or otherwise indicates his or her desire not to cause it to be investigated to

completion."[18] This highlights the fact that the goals of the Agency (AHCA) - - a thorough investigation, transparency, and protection of the patient - - and those of the health system - - rapid resolution, opacity and the protection of the employee - - do not appear to be aligned.

22. LEE MEMORIAL HEALTH SYSTEMS failed to conduct a Root Cause Analysis in all 16 allegations of sexual assault.

23. A Root Cause Analysis differs from a general investigation into the claim. A Root Cause Analysis is a process for identifying the basis or causal factors underlying variation in performance. Variation in performance can (and often does) produce unexpected and undesired adverse outcomes, including the occurrence or risk of a "Sentinel Event." Root Cause Analysis often provides answers regarding how or why an adverse incident occurred and is directed at correcting the variation in performance to prevent future adverse incidents.

24. LEE MEMORIAL HEALTH SYSTEM staff and risk managers had a practice of disbelieving patients when allegations of sexual assault were raised. This pattern of accepting employee representations, and disbelieving patient complaints, is shown in a summary of the sexual assault investigative materials along with observations from the documents. (*See* **Exhibit "B"**, Past Sexual Assault Investigation Summary.)

25. The materials, interviews, and discussions summarized in this exhibit show that the hospital staff routinely had a custom of disbelieving the patient making the accusation.

26. For example, the sexual assault documents show that hospital staff often concluded that:

    a. The patient "gave a conflicting story" when the conflicting portions were minor and inconsequential to the events (2013-GCMC-JM);

---

[18] The 2016 *Florida State Statutes*, Chapter 395, Hospital Licensing and Regulation, 395.1046, Complaint investigation procedures.

b. The patient was not credible because she had made similar allegations in the past even though the hospital did not have any proof that prior allegations had been made (*Id.*);

c. The patient was a "liar" after she advised them that a male CNA forced her to give him oral sex (2013-GCMC-JM);

d. That the patient was "manipulative" (2013-GCMC-JM);

e. There was no "conclusive evidence that would validate the allegation of sexual assault" (2013-GCMC-MR);

f. The accused was being set-up by the patient for blackmail purposes even though the accused later admitted to the sexual contact (2013-GCMC-MW);

g. The accused was being truthful because he "broke down into tears and emphatically denied any wrongdoing" (2014-CCH-HT);

h. The patient was "not credible" because she reportedly had another complaint against a different hospital (2014-CCH-HT);

i. The accused admitted to making several inappropriate statements but the "intention was different than what was perceived" (2014-CCH-HT);

j. The patient was inconsistent in her story based on minor issues that were inconsequential to the event (2014-GCMC-DD);

k. The patient was "morally unfit and untrustworthy" even though the accuser later admitted to having sex with the patient (2014-LMH-DW);

l. The accused employee was being honest regarding the sex being consensual and he was more "credible" because he came clean to risk management (2014-LMH-DW);

m. The patient was not believable because she was a Baker Act patient (2014-LMH-JK);

n. The patient's story was "mixed" even though this was the third time that this employee had been accused of being sexually inappropriate with a patient (2015-GCMC-JW); and

o. The patient was not believable because she was inconsistent with the number of fingers the employee stuck in her vagina and the location of her panties during the second assault (Brianna Hammer).

27. Often, LEE MEMORIAL HEALTH SYSTEM used language such as "unfounded" or "unsubstantiated" when documenting its conclusions. The hospital used these terms in a majority of the cases and often advised the Department of Health that the claims were unsubstantiated, *even before a thorough investigation occurred.*

28. In one investigation, the risk manager of the hospital and the system investigator told an accused employed that: "We don't [pay] - - even when these complaints are valid - - we don't pay." (2013-GCMC-MW000119). This clearly gives the impression that such actions will not be punished or taken seriously by the hospital system. The extent to which the organization will go to protect the employee is further illustrated by the failure of HECHAVARRIA's supervisor to take any action whatsoever upon his report to her that he had been arrested for assault and battery. In fact, in his deposition, Hechavarria describes her response as "emotional and concerned. . . .she tried to console me. . . .it was a rough moment for me."[19]

29. In the aforementioned case (2013-GCMC-MW), the accused admitted to touching a patient's genitals sexually and the employee was allowed to resign as opposed to being terminated. This would give the impression to others within the hospital system that such actions were not seriously pursued and discipline would be lenient.

30. In another case (2014-CCH-HT), the accused was disciplined because he previously had two (2) other written sanctions against him but he was told he was not being disciplined for the sexual assault claims. The employee was not fired and did not face any discipline for the sexual assault claim and was not required to undergo any additional training or supervision.

---

[19] Deposition of Jeovanni Hechavarria, June 12 2018, pg. 81.