**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

DONIA GOINES,

      Plaintiff,

v.                                                                  CASE NO. 2:17-CV-00656-JES-CM

LEE MEMORIAL HEALTH SYSTEM
d/b/a CAPE CORAL HOSPITAL; and
JEOVANNI HECHAVARRIA, R.N.,

      Defendants.

_____/

**DEFENDANT LEE HEALTH'S SECOND AMENDED**
**MOTION FOR SPOLIATION SANCTIONS AND**
**INCORPORATED MEMORANDUM OF LAW IN SUPPORT**

Defendant Lee Memorial Health System ("Defendant Lee Health"), by and through its undersigned attorneys, submits this Second Amended Motion for Spoliation Sanctions and Incorporated Memorandum of Law in Support.

## I.      INTRODUCTION

This case involves allegations by Plaintiff Donia Goines that one of Defendant Lee Health's nurses, Defendant Jeovanni Hechavarria, sexually assaulted her shortly after midnight on July 17, 2016.  This particular dispute involves the deletion of Goines's Facebook account.  At some point after being served with discovery from Defendant Lee Health specifically requesting certain Facebook posts, Goines permanently deleted her account, preventing anybody from ever determining what all was lost, though it is undisputed that at least some lost posts were harmful to her claims.  Moreover, Goines admitted in a recent deposition that she did not participate in discovery in good faith, as she never even attempted to check her Facebook before deleting it to determine whether there were responsive posts.  Unfortunately, Defendant Lee Health is without

1

any other options; a motion to compel will not un-delete the account, and Defendant Lee Health has incurred considerable expenses in pursuing relief from Goines's destruction of evidence. Therefore, Defendant Lee Health respectfully requests adverse spoliation instructions along with an award of its fees and costs pursuant to 28 U.S.C. § 1927, the Federal Rules of Civil Procedure, and this Court's inherent authority.

## II.   BACKGROUND

### A.   Goines's Allegations and Facebook Posts

Donia Goines claims that in the early morning hours of July 17, 2016, Hechavarria sexually assaulted her while she stayed in the hospital as a patient.   Goines asserts the problems began around 10:00 p.m. on July 16, which was Hechavarria's second visit to Goines's room when he allegedly told Goines she was "very pretty" and touched her inappropriately in a sexual manner. Exhibit A, Goines 2018 Depo, at 238:4–240:18.   According to Goines's testimony, he reentered the room about an hour later, though Goines does not remember anything from that particular visit. *See id.* at 244:4–247:7.

The purported assault itself occurred a few hours later, between 1:00 and 2:00 a.m. on July 17, 2016, according to Goines's testimony.   *See id.* at 247:11–248:10, 248:25–250:23 ("Sometime after midnight in the very early morning.").   Goines testified that afterwards, she could only lie on her bed in shock.   *Id.* at 258:23–25.   Goines stated that she did not go on Facebook, use her cell phone, search the internet or go on any social media that night or the following morning. *Id.* at 267:6–15.   Goines supposedly used her cell phone to call one of her Facebook friends in Washington the next morning.   *Id.* at 267:19–268:23.   However, when questioned further about this, Goines admitted that she does not have the friend's phone number.   *Id*. at 269:22–270:8.   In fact, Goines's cell phone records do not show any calls to or from Washington when Goines claims she was speaking to her friend on the telephone.   *See generally* Docket 123 ex. B.   Goines had

previously told the investigators at Lee Health that she had contacted her friend via Messenger on Facebook.  Goines has never produced any records from her Facebook or Messenger accounts.

Following the alleged assault, Goines claims that her "whole life has been derailed"—she isolates herself in her house, does not eat, cannot sleep, and is constantly paranoid.  *Id.* at 288:4–17, 289:17–290:12.  Goines claims that her inability to go into public continues to this day and, in fact, her condition has become worse over time.  *Id.* 288:7–24.  In contrast, Goines's Facebook (before its deletion) provided a different timeline of events.  Notwithstanding her unequivocal testimony that she did *not* use social media in any form the night of the claimed attack, her Facebook account revealed the following series of posts on the night in question:

1. **Undefined Time on July 16:** Goines shared a picture saying "comon [sic] sense is a flower that doesn't grow in everyones [sic] garden."  Exhibit B, Goines's Facebook posts at 7.

2. **1:01 a.m. on July 17:** Goines shared a picture from a motivational speaker that said, "Appreciate who you have if you have a good person.  Count the good things and see if they outweigh the bad.  Don't chase fairytales.  Fix your reality."  *Id.* at 6, 11.

3. **1:12 a.m. on July 17:** Goines shared a picture from a page called "Lez Get Erotic" outlining "3 Rules in Relationship [sic].  Don't lie.  Don't cheat and don't make promises you can't keep."  *Id.* at 12.

4. **1:16 a.m. on July 17:** Goines used Facebook's check-in feature to inform her friends she was at Cape Coral Hospital and was "[g]etting well."  *Id.* at 5, 13.  At 11:48 a.m. on July 18, in response to a comment from one of her friends telling her to "get well," Goines replied, "I'm trying, I'm trying!!"  *Id.*[1]

5. **3:37 a.m. on July 17:** One of Goines's Facebook friends, Tameeka Gibson, commented on the "Lez Get Erotic" picture describing its advice as "[t]rue indeed."  Somebody used Facebook's "like" feature to give a thumbs up to Gibson's comment.  *Id.* at 12.

---

[1]   In her most recent deposition, Goines falsely testified that she never used Facebook's check-in feature.  Goines Depo., at 36:3–10.  It is impossible to be certain, given the lack of ability to examine her Facebook, which other claims Goines has made regarding the account are false.

6. **Undefined Time before 9:22 a.m. on July 17:** Goines posted a picture to her account saying "Share if you ugly [sic]." *Id.* at 5, 14. In response to a 9:22 a.m. comment on the picture by one of her friends, Goines said at 9:55 a.m., "Lol..... I was joking." *Id.*

Additionally, Goines's subsequent Facebook posts, along with those by her then-boyfriend Paul Jimmison, demonstrated that she was getting out and spending time with her friends in the months following the supposed assault. *See generally id.* at 1–4; Exhibit C, Jimmison Social Media Posts. In fact, the limited Facebook pictures Lee Health has been able to view show Goines going to the beach and on vacation during this time. *Id.*

On August 18, 2016, Defendant Lee Health received a demand letter from a law firm advising that it represented Goines and intended to file a lawsuit against Defendant Lee Health. Exhibit D. Upon receiving this letter, Defendant Lee Health's counsel, Mark Haskins, had one of his associate attorneys run a Facebook search on Goines. The associate saved fourteen pages of screenshots, though several of the pages were duplicates of each other. The associate only recovered a few screenshots of the posts that were most obviously relevant at the time—i.e., the posts dated around the time of the alleged incident—given the assumption that formal discovery would yield a deeper look at Goines's Facebook. The associate did not print out all of the comments following each post or the "likes," again assuming this information could be collected during discovery. Similarly, the associate did not capture any screenshots detailing Goines's posting history and practices before and after the alleged incident. A subsequent attempt by defense counsel in February 2018 to access Goines's Facebook page revealed that it was no longer publicly accessible, though it still apparently existed.

B. **Procedural History**

Goines filed her lawsuit on October 25, 2017, and Defendant Lee Health properly removed it to this Court on November 30. Docket 1, at 2. On February 2, 2018, Defendant Lee Health

4

submitted interrogatories and requests for production to Goines asking her to provide information about her social media accounts.  Goines's initial responses to these requests did not come until April 23, 2018; in them, she claimed that her Facebook had been deactivated in October 2017, and that she could not retrieve its contents but did "not believe" that any of her posts were responsive[2]. Exhibit E, Goines's Answers to Interrogatories; Exhibit F, Goines's Response to Request for Production.  She supplemented her answers on May 16, again alleging that she could not access her "former Facebook account," but claiming that she "attempted to gain access to it."  Exhibit G, Goines's Supplemental Interrogatory Answers, at 6.  It is important to note that there is a difference in deactivating a Facebook account and deleting one.  A deactivated Facebook account can be reactivated by simply logging into Facebook using a user name and password and clicking a reactivatation button.  A deleted Facebook account cannot be accessed by logging in and cannot be undeleted.  https://www.facebook.com/help/250563911970368?helpref=hc_global_nav

As a result of its belief that the Facebook was irretrievably lost, and given that Goines did not supplement her original responses with any posts, Defendant Lee Health did not follow up with additional requests for production seeking more posts, instead focusing its efforts on attempting to determine what had actually happened to the account.  Subsequent discovery, however, demonstrated that Goines's original discovery answers were false and that she did not participate in discovery in good faith.  Defendant Lee Health began learning about these falsehoods over the next few months.  First, it obtained an e-mail from her therapist discussing her ability to

---

[2]  In her 2019 deposition, Goines admitted that she frequently deactivated and reactivated her Facebook account; thus, her claim in her April 2018 discovery responses that she could not retrieve materials from her Facebook account because it was allegedly "deactivated" was not truthful.  Goines, at 52:16-24, 53:19-22.  There is a difference in deactivating a Facebook account and deleting one.  A deactivated Facebook account can be reactivated by simply logging into Facebook using a user name and password and clicking a reactivate button.  A deleted Facebook account cannot be access by logging in and cannot be undeleted. https://www.facebook.com/help/250563911970368?helpref=hc_global_nav

use the purported assault to solicit donations on her Facebook account.  *Id.* at 5.[3]  Second, Goines

admitted in her June 2018 deposition that she had at least reactivated her Facebook for a few weeks

after receiving the discovery requests, though she did not attempt to look for any responsive

posts—as she put it, "Why would I? . . .  What do I need to discover?"  Exhibit A, at 330:10–

331:4.[4]  Third, Goines's boyfriend, Todd Patrick, admitted in his own deposition that Goines had

reconnected with him on Facebook in April or May of 2018.  Exhibit H.[5]

In repeated efforts to resolve this issue, the undersigned reached out to Goines's attorney

setting forth a complete factual accounting of events via letter.  Exhibit I.  Goines's attorney

responded, and suggested that Defendant Lee Health's counsel somehow misinterpreted the

testimony in Goines's deposition, and that Goines had in fact deleted her Facebook in

October 2017.  Although Goines signed a release in September 2018 for her Facebook records,

Facebook was unable to find any records of the account and could not provide any details from it.

Exhibit J.  Therefore, Defendant Lee Health filed its original motion for spoliation sanctions in

December 2018.  *See generally* Docket 123.  Following Defendant Lee Health's filing of this

motion, several letters were sent to the Court and parties claiming that an insider with the firm

representing Goines had information that Goines and her attorney intentionally spoliated the

account.  In response to these letters, along with Defendant Lee Health's original motion, this

---

[3]    In her 2019 deposition, Goines initially admitted that she had typed this letter to her psychiatrist.  Goines Depo.,
at 92:16–93:3.  She quickly changed course, however, and suggested that some unidentified person must have
used her e-mail account and typed the e-mail to her psychiatrist; she did not clarify who purportedly did this.  *Id.*
at 93:14–98:5.

[4]    Goines's counsel proceeded to interrupt the deposition at this point and claim he could "clear [the] issue up" if
Defendant Lee Health's attorneys e-mailed him.  Exhibit A, at 331:5–333:9.

[5]    Defendant Lee Health was denied the opportunity to question Goines during her June 2018 deposition about how
she connected with Patrick, as she falsely claimed she did not have a boyfriend or significant other.  Exhibit H.

In any event, it is now beyond question that Goines could have reactivated her account at any time after receiving
Lee Health's discovery requests and, in fact, accessed her Facebook account around April 2018, well after
Defendant Lee Health served its initial discovery requests.  Goines Depo., at 9:23–10:8, 66:9–11.

Court reopened discovery on the limited spoliation issue and granted the parties until June 21, 2019, to file any related motions.  Docket 176.

Defendant Lee Health's discovery during the last few months has yielded additional evidence supporting the conclusion that Goines spoliated the evidence of her Facebook, and it indisputably demonstrated that Goines did not participate in discovery in good faith.  As a starting point, the depositions of Goines and her counsel suggested that Goines did not receive adequate legal advice regarding her duty to preserve evidence.  In her deposition, Goines initially suggested she had not heard anything about her duties to preserve evidence "until now" (her deposition).  Goines Depo, at 60:16–61:13.[6]  Likewise, both Goines and her counsel admitted that she did not receive from her counsel *any* written communications informing her of her duty to preserve evidence.  *Id.* at 60:21–61:13; Fogg Depo, at 9:10–24, 17:16–19, 22:18–23:13, 24:21–25:5, 26:17–22.[7]  This lack of any document preservation communications was despite the admission by Goines's counsel that he knew it was not unusual to be asked for social media posts during civil discovery.  Fogg Depo., at 66:4–7.  At most, Goines suggests she had one verbal discussion with her counsel in which he told her not to delete the Facebook, though she apparently disregarded his advice and deleted it anyways "[b]ecause I figured it was mine.  It was irrelevant.  I still don't know the relevance of it now."   Goines Depo., at 62:18–63:23.

---

[6]   Plaintiff sent the depositions of Donia Goines and Ryan Fogg, taken May 6, 2019, to the Court for *in camera* review.  As the Plaintiff intends to file these deposition under seal, all references to "Goines Depo" or "Fogg Depo" refer to the deposition transcripts sent to the Court on June 21, 2019.

[7]   Goines's counsel testified that the letter his firm sent Goines does in fact mention social media accounts, though not in the context of preserving them.  Fogg Depo., at 24:4–20.  Although Defendant Lee Health has a motion outstanding to compel the production of this initial letter, Docket [190], its conclusion based on the testimony is that the letter says something to the effect of being careful about posts on social media, as they can be evidence against the client.  A client might interpret this type of language as being a subtle hint to delete prior harmful posts.

5862460v.1

The depositions also revealed an utter lack of care and good faith exercised in response to Defendant Lee Health's discovery requests.  Goines flat-out admitted that she never attempted to look through her emails nor through her Facebook—even while it was re-activated around April 2018—to determine whether there were any materials responsive to Defendant Lee Health's requests.  *Id.* at 45:19–46:3, 67:21–68:12, 85:1–86:4,[8] 86:17–87:3; *cf. id.* at 71:6–15, 72:18–21, 74:6–11 (admitting that Goines did not look through her e-mails to determine whether any documents responsive to Defendant Lee Health's requests existed); Goines Depo., at 45:19–46:3 (admitting that Goines did not look through her Facebook posts to determine whether any documents responsive to Defendant Lee Health's requests existed).  Likewise, Goines's counsel admitted that nobody from his office affirmatively told Goines she should check her Facebook for any responsive posts.  Fogg Depo., at 52:22–53:8; *see also* Goines Depo., at 67:21–68:12, 86:17–87:3.

Discovery during the last few months uncovered even more troubling behavior and claims about Goines's Facebook account.  For example, Goines's counsel testified that he looked through her Facebook once, and it was before filing the complaint.  Fogg Depo., at 12:19–13:5.  Goines specifically recalls this occurring and that he Facebook account was public so everyone could view the contents.  Goines Depo., at 34:6-34, 104:20-105:19.  Goines's counsel also testified that after Defendant Lee Health requested Goines supplement her discovery responses regarding Facebook, he personally spoke with Goines to get her Facebook username and password to confirm the account status.  Fogg Depo., at 43:3-44:1.  He testified that he attempted to access the account,

---

[8] Goines claimed in her testimony that she did not bother checking because she did not believe any posts were responsive.  But the few screenshots Defendant Lee Health has demonstrate this claim is certainly false with respect to the night of the alleged assault.  Exhibit B, at 5, 13.  Moreover, Goines certainly continued posting to her Facebook, including images demonstrating she was not the shut-in she claims to be.  *See* Goines Depo., at 36:18–37:13, 39:24–25.  Defendant Lee Health does not have images of these posts and cannot now obtain them.

received a message inquiring if he wanted to "reactivate" the account, but allegedly could not do so because of incorrect user name – even though his client seemed certain she gave him the correct information.  Fogg Depo., at 44:9-45:5.

If Goines's counsel is to be believed, then Goines's motives become even more questionable because she somehow remembered the correct username and password and then quickly deleted the account within hours or days of her attorney's supposed efforts[9].  Even stranger, however, Goines has adamantly maintained throughout this litigation that she never gave her password to anybody, including her attorney, and does not corroborate her counsel's claims that he tried to access her account with her password.  Goines Depo., at 34:6-35:10.  Further, it is unrefuted that nobody from Goines's counsel's office ever asked her to show them what she had posted during the alleged assault or in the year of the purported assault.  *Id.* at 64:18–20.  Goines also did not make any additional efforts to access the account after learning about Defendant Lee Health's December 2018 motion for spoliation sanctions.  *Id.* at 101:16–22.

## III.     STANDARD FOR DETERMINATION

A federal district court has broad authority to craft appropriate spoliation sanctions using its "inherent power to manage its own affairs and to achieve orderly and expeditious disposition of cases."  *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005); *accord Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009).

A court's "authority to issue sanctions for attorney misconduct under § 1927 is either broader than or equally as broad as the district court's authority to issue a sanctions order under its inherent powers."  *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007).

---

[9] Goines would have needed the correct user name and password to delete the account; and, if Goines' counsel's claim that he was prompted to reactivate the account and tried to do so are true, then the account was not yet deleted

5862460v.1

Rule 26(g)(1)(b)(i) requires parties or their attorneys to sign their discovery responses for purposes of certifying compliance with the discovery provisions of the Federal Rules of Civil Procedure. Rule 33 requires parties to produce accurate information in response to interrogatories, and Rule 34 imposes an obligation on parties to permit inspections of electronic information in their control. If a party improperly certifies a discovery response, a court "must impose an appropriate sanction on the signer . . . ." Fed. R. Civ. P. 26(g)(3).

## IV.   MEMORANDUM OF LAW

At this point, the evidence is clear: Goines deleted her Facebook even though she was aware Defendant Lee Health was seeking evidence from it, she never searched her Facebook for responsive documents, and she apparently never received proper instructions about the importance of preserving evidence. Moreover, neither she nor her counsel participated in discovery in good faith. To that end, Defendant Lee Health is seeking remedies in the form of its costs incurred in pursuing this spoliation issue, along with adverse spoliation instructions. This Court's ability to award those sanctions arises from 28 U.S.C. § 1927, the Federal Rules of Civil Procedure, and the Court's own inherent authority.

### A.   The conduct of Goines's counsel is sanctionable under 28 U.S.C. § 1927.

28 U.S.C. § 1927 provides that "[a]ny attorney . . . who so multiples the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The Eleventh Circuit has explained that the touchstone of § 1927 is whether the attorney's conduct was "tantamount to bad faith." *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007) (quoting *Avirgan v. Hull*, 932 F.2d 1572, 1582 (11th Cir. 1991)). For purposes of this inquiry, however, the emphasis is on the attorney's objective conduct; "§ 1927 does not require a malicious intent or a bad purpose." *Id.* at 1239–40. Rather, a showing that the attorney's conduct was

objectively reckless "is enough to warrant sanctions even if the attorney does not act knowingly and malevolently." *Id.* at 1241. In this context, "reckless conduct simply means conduct that grossly deviates from reasonable conduct." *Id.* at 1240. For example, an attorney was liable under Section 1927 for "either carelessly or deliberately" participating "in the cover up of . . . damaging evidence" in *Malautea v. Suzuki Motor Co., Ltd.*, 987 F.2d 1536, 1544 (11th Cir. 1993). Likewise, the Seventh Circuit upheld an order finding an attorney liable for repeatedly and falsely denying that certain documents existed without ever making a reasonable inquiry into the matter. *Martinez v. City of Chicago*, 823 F.3d 1050, 1056–57 (7th Cir. 2016).

Importantly, courts are not limited to examining discrete instances of an attorney's conduct during litigation for purposes of determining whether he or she acted unreasonably and vexatiously. Rather, "a court may rely on the totality of the circumstances" and consider the attorney's conduct as a whole. *In re Engle Cases*, 283 F. Supp. 3d 1174, 1225 (M.D. Fla. 2017). As the Eleventh Circuit explained in *Byrne v. Nezhat*, Section 1927 obligates attorneys "to avoid dilatory tactics throughout the entire litigation." 261 F.3d 1075, 1106 (11th Cir. 2001). Moreover, Section 1927 does not require affirmative conduct; inaction in bad faith is sufficient. *In re Engle*, 283 F. Supp. 3d at 1225.

Notably, the Eleventh Circuit has not yet addressed the burden of proof for imposing sanctions under Section 1927—i.e., preponderance of the evidence or clear and convincing evidence. This Court assumed without deciding that the clear and convincing standard applied. *See In re Engle*, 283 F. Supp. 3d at 1225. *In re Engle* did not require this Court to make the burden of proof determination, as the attorney's conduct was clearly sanctionable under either standard. *See id.* at 1225–26. Although Defendant Lee Health believes the actions in this case are sanctionable under either standard, given the clear deposition testimony, the appropriate standard

11

would seem to be preponderance of the evidence.  This conclusion arises from the fact that other circuits have found that the preponderance of evidence standard applies to sanctions under a court's inherent authority, and the Eleventh Circuit has held that Section 1927 is at least as broad as a court's inherent authority.  *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776–77 (7th Cir. 2016); *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007).  As the Seventh Circuit noted in *Ramirez*, Supreme Court precedent strongly suggests a presumption that unless a statute or rule explicitly states otherwise, the default burden of proof in civil matters is preponderance of the evidence.  845 F.3d at 777–78.[10]

In this case, there are several examples of reckless attorney conduct with respect to the Facebook page similar to the attorney's failure to make a reasonable inquiry into the existence of responsive documents in *Martinez*, 823 F.3d 1056–57.  First, Goines's counsel failed to prevent the spoliation issue from arising by inadequately educating Goines with respect to her obligations to preserve evidence.  By his own admissions, nobody from his office sent Goines any written communications informing her of the need to preserve potentially relevant evidence.  Fogg Depo., at 9:10–24, 17:16–19, 22:18–23:13, 24:21–25:5, 26:17–22; *accord* Goines Depo., at 60:21–61:13. Although Goines's counsel might have had one verbal communication in which he told her not to delete the Facebook account, Goines Depo., at 62:18–63:23, he clearly failed to impress upon his client the importance of preserving evidence, as she repeatedly testified she had not even heard of the obligation to preserve evidence until the day of her 2019 deposition, *id.* at 60:16–61:13.  This lack of formal document preservation communications was despite the admission by Goines's counsel that he knew it was not unusual to be asked for social media posts during civil discovery

---

[10]   Specifically, the Supreme Court cases cited by the *Ramirez* court rejected a clear-and-convincing-evidence standard in cases involving enhanced damages for patent infringement, fee-shifting statutes, dischargeability of debts in bankruptcy, employment discrimination, and securities fraud.

and he had personally reviewed the account and should have been aware it contained relevant content. Fogg Depo., at 12:19–13:5, 66:4–7.

Second, there were obvious breakdowns in the discovery process resulting in responsive posts from the Facebook not being produced to Defendant Lee Health and subsequently being destroyed. As a starting point, the contempt Goines displayed for the discovery process in her depositions is indicative of a reckless failure to advise a client with respect to her legal obligations. When asked in her 2018 and 2019 depositions whether Goines had checked her Facebook account for posts responsive to Defendant Lee Health's requests, her reply was, "Why would I?" Exhibit A, at 330:10–331:4; Goines Depo., at 45:19–46:3.

Moreover, both Goines and her attorney testified that nobody affirmatively asked Goines to check her Facebook for responsive posts. Goines Depo., at 67:21–68:12, 71:6–15, 72:18–21, 74:6–11; Fogg Depo., at 52:22–53:8. This was despite the fact that Goines's counsel had seen her Facebook on a prior occasion, and accordingly should have known there were responsive posts, as described below. Yet in his deposition, Goines's counsel indicated his approach was to simply ask Goines whether any responsive posts existed and then blindly accept her answer without *any* type of independent inquiry. Fogg Depo., at 69:1–10. In other words, he apparently turned over Defendant Lee Health's requests and told Goines to make her own legal judgment regarding the responsiveness and relevancy of any posts. *See Martinez*, 823 F.3d 1056–57; *cf.* Goines Depo., at 62:18–63:23 (suggesting that Goines has absolutely no idea about the concept of legal relevance). And it is worth noting that Goines's counsel apparently did not ask her whether she *actually* checked her Facebook, as she has been candid recently in admitting she never did. Goines Depo., at 45:19–46:3, 67:21–68:12, 85:1–86:4, 86:17–87:3.

Goines's counsel has suggested his response to these allegations is that none of the posts on her account were responsive to the *particular* request Defendant Lee Health served. This proposed counterargument is clearly without merit. First, there indisputably is at least one post that was responsive. *See* Exhibit G, at 4 (requesting any posts referencing Defendant Lee Health or Goines's "hospitalization with Defendant Lee Health"); Exhibit B, at 5, 13 (using Facebook's check-in feature to inform Goines's friends she was at Cape Coral Hospital). Second, many of the Facebook posts are directly relevant to the issues in this lawsuit, namely Goines's claims regarding her damages. Third, this potential counterargument ignores the fact that Defendant Lee Health could and would have served follow-up requests for production.

This situation is not one in which Defendant Lee Health was blindly searching for posts. Rather, it had in its possession screenshots of several of the posts, and it would absolutely have been aware if Goines had failed to produce them all.[11] From there, Defendant Lee Health would have followed up with tailored requests based on how Goines purported to withhold the other posts—for example, it could have used tailored requests seeking all posts made on certain dates. Instead Defendant Lee Health got sucked into a pointless venture trying to determine whether the account in fact even existed anymore. There was no need to request additional production from an account that Goines and her attorney falsely claimed no longer existed. If accepted, Goines's counterargument would permit a party to create confusion that diverts the attention of the opposing party, and then use that confusion to run the clock on litigation deadlines. In essence, Goines's counsel is attempting to force Defendant Lee Health to argue what it *might* have done in a

---

[11]   As discussed below in Section IV.C.2, the mere fact Defendant Lee Health possess screenshots of *some* of Goines's posts does not prevent the harm that arose from its inability to examine the account in greater detail through additional discovery. It can never go back and attempt to compare Goines's posting history before and after the alleged incident, and the electronic data (such as data on who "liked" certain posts) is irretrievably gone. There is also no ability to conduct discovery on the communications Goines allegedly had with an unidentified "friend" via Facebook Messenger regarding the alleged assault.

counterfactual scenario in which the Facebook was not spoliated and the discovery responses were not incomplete and inaccurate. This approach is effectively procedural gamesmanship. *See Devore v. Howmedica Osteonics Corp.*, 658 F. Supp. 2d 1372, 1380 n.13 (M.D. Fla. 2009) (recognizing that the Court does not countenance gamesmanship).

Therefore, Defendant Lee Health respectfully requests the relief envisioned by Section 1927: All the costs, fees, and expenses it has incurred in trying to sort through the mess caused by the reckless failures of Goines's counsel. These expenses include (1) the preparation of this motion, (2) the preparation of the original and first amended spoliation motions, (3) all discovery over the past few months, (4) the deposition of Todd Patrick, (5) letters and other communications with opposing counsel, (6) legal research, and (7) time spent deposing Goines on the existence of her Facebook account that could have been spent on other matters. None of these expenses were necessary had proper litigation procedure been followed. Yet Defendant Lee Health has been forced to bear them to date in its efforts to undo the harm flowing from Goines's spoliation of her Facebook account.

**B.      The conduct of Goines and her counsel is sanctionable under the Federal Rules of Civil Procedure.**

Goines and her counsel should also face sanctions for violating the Federal Rules of Civil Procedure. Rule 26(g)(1)(b)(i) requires parties or their attorneys to sign their discovery responses for purposes of certifying compliance with the discovery provisions of the Federal Rules of Civil Procedure. Considering that Rule 33 requires parties to accurately answer interrogatories and Rule 34 requires them to permit inspections of electronic information, a signature on a response to either type of discovery tool certainly implies that the provided answers are true. (The alternative is to suggest that Rule 26(g) does not prohibit parties from lying in their discovery responses, which is illogical.) If a party improperly certifies a discovery response, a court "must impose an

appropriate sanction on the signer . . . ."  Fed. R. Civ. P. 26(g)(3).  These sanctions can include "an order to pay the reasonable expenses, including attorney's fees, caused by the violation."  *Id.* Moreover, parties have an ongoing obligation to supplement prior discovery responses if they later find additional information or documents, and a failure to produce documents or supplement discovery is sanctionable under Rule 37.  Fed. R. Civ. P. 26(e); MIDDLE DISTRICT DISCOVERY, at 13 (2015).

As a starting point, Goines's general contempt towards the discovery process, as displayed in her depositions, is galling.  Rather than recognizing the importance of following the Federal Rules of Civil Procedure and preserving and producing requested information, Goines flat-out admitted she never checked her Facebook for responsive posts because "Why would I?"  Goines Depo., at 45:19–46:3; *see also* Exhibit A, at 330:10–331:4 ("Why would I [check my Facebook]? . . .  What do I need to discover?").  Had she actually participated in discovery by reactivating her account upon receipt of Defendant Lee Health's discovery requests in February 2018 or, at the very least, examining her account when she reactivated it around April 2018, she would have found at least one obviously responsive post to what Defendant Lee Health had already sought[12].  *See* Exhibit G, at 4 (requesting any posts referencing Defendant Lee Health or Goines's "hospitalization with Defendant Lee Health"); Exhibit B, at 5, 13 (using Facebook's check-in feature to inform Goines's friends she was at Cape Coral Hospital).[13]

---

[12] In fact, Goines admitted that she often deactivated and reactivated her Facebook account due to "drama" and, thus, could have easily reactivated her account when she received Lee Health's discovery requests in February 2018. Rather, she chose to ignore them.  Goines Depo., at 52:16-24, 53:19-22.

[13] Although this motion centers on Goines's Facebook account, it is equally troubling that she failed to respond to Defendant Lee Health's discovery requests in other ways, such as her absolute failure to check for responsive e-mails, which inarguably existed given that her therapist produced a few emails between he and Goines.  Goines Depo., at 71:6–15.  In fact, relevant emails may still exist, but Plaintiff and her counsel have taken no subsequent action to cure their discovery deficiencies.

Moreover, it does not appear that her counsel made any reasonable efforts to ensure she was complying in good-faith with discovery. This Court's discovery handbook has a clear mandate to attorneys:

> Upon receiving a document request, counsel should promptly confer with the client and take reasonable steps to ensure that the client (i) understands what documents are requested, (ii) has adopted a reasonable plan to obtain documents in a timely and reasonable manner, and (iii) is purposefully implementing that plan in good faith.

MIDDLE DISTRICT DISCOVERY, at 11–12 (2015). But in this case, Goines stated that nobody asked her to check her Facebook (or e-mails) in response to Defendant Lee Health's requests. Goines Depo., at 67:21–68:12, 71:6–15, 72:18–21, 74:6–11. Her counsel likewise admitted that neither he nor anybody from his office affirmatively told Goines to check her Facebook for responsive posts. Fogg Depo., at 52:22–53:8. This was despite the fact that he had actually seen Goines's Facebook on a prior occasion, and accordingly should have been aware she was posting during the time of the purported incident including one post referencing her stay at Cape Coral Hospital. Fogg Depo., at 12:19–13:5. In any event, "Why would I [check for responsive posts]?" is not the statement of a client that has received adequate instruction of her obligations under the discovery rules. *See* Goines Depo., at 45:19–46:3; Exhibit A, at 330:10–331:4. And certainly that client would not be testifying that she "did not know about discovery." *See* Goines Depo., at 71:6–15.

Regardless, the fact remains that responsive posts did in fact exist at the time Defendant Lee Health served its request, and Goines should have reactivated her account at that time or, at a minimum, she was obligated to turn over those posts once she reactivated her account in 2018. Fed. R. Civ. P. 26(e) (imposing on parties an obligation to supplement prior discovery responses and document productions). Goines's counsel signed and certified her written discovery responses stating that there were no responsive documents and suggesting her Facebook account was lost. Exhibit E; Exhibit F. Given the failures to participate in discovery and provide honest answers

and document productions, Goines and her counsel committed sanctionable offenses as described in Rules 26(g)(3) and 37.  Therefore, Defendant Lee Health requests an appropriate sanction, particularly the adverse instructions requested in Section IV.C.2 below along with the costs it has incurred attempting to sort through the needless confusion caused by these discovery misrepresentations.

### C.     The conduct of Goines is sanctionable under this Court's inherent authority.[14]

Lastly, Goines's spoliation of her Facebook account is sanctionable under this Court's inherent authority.  Applying the Court's inherent authority presents a two-part inquiry.  First, Defendant Lee Health must demonstrate that Goines spoliated the account.  If it does so, the second question is to determine appropriate sanctions designed to remedy the harm caused by the spoliation.  In this case, Goines's Facebook account was demonstrably spoliated, and Defendant Lee Health is requesting as sanctions an award of its costs caused by the spoliation along with five adverse jury instructions.

### 1.     Defendant Lee Health can demonstrate that Goines spoliated her account.

Although the Eleventh Circuit has not expressly mandated a test for finding spoliation, it has suggested that district courts should look to state law principles, provided those principles are consistent with federal law.  In its *Southeast Mechanical* decision, this District found that Florida law requires the movant seeking spoliation sanctions to demonstrate (1) the evidence once existed, (2) the spoliator had a duty to preserve the evidence, and (3) the evidence was crucial to the case. *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1299 (M.D. Fla. 2009).  The *Southeast*

---

[14]   Although the conduct of Goines's counsel is also sanctionable under this Court's inherent authority, the Eleventh Circuit has observed that Section 1927 is either as broad as or broader than a court's inherent authority. *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1239 (11th Cir. 2007).  Given that Section IV.A of this motion already addressed Section 1927, it is unnecessary to address this Court's inherent authority with respect to Goines's counsel.

*Mechanical* court emphasized two additional points: First, "[i]n spoliation cases, courts must not hold the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence because doing so allows the spoliators to profit from the destruction of evidence." *Id.* And second, the Eleventh Circuit requires a showing of bad faith on the part of the spoliator before sanctions become appropriate. *See id.*

In this case, both of the required elements are present. First, there is absolutely no dispute at this point that the Facebook account existed as recently as April 2018—well after Defendant Lee Health had affirmatively requested its contents in discovery. *See, e.g.*, Goines Depo., at 9:23–10:8, 66:9–11. Second, Goines certainly had a duty to preserve evidence of her Facebook once Defendant Lee Health affirmatively requested information from it on February 2, 2018, thus putting her on notice it was interested in the account's contents. Moreover, this duty to preserve the evidence began to apply once Goines even contemplated suing the defendants; case law in this jurisdiction clarifies that the duty to preserve potentially relevant evidence applies even to *potential* litigation. *Swofford v. Eslinger*, 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009).

Third, the evidence was crucial to this case as it undermines several of Goines's allegations, such as her claims of being a shut-in and even whether she was actually assaulted. Goines claimed to have been assaulted between 1:00 to 2:00 a.m., which was the exact time she was busy sharing posts on Facebook from pages such as "Lez Get Erotic." Exhibit A, at 247:11–250:23; Exhibit B, at 5–6, 11–13. Likewise, her posts from the following morning seem ordinary, suggesting nothing traumatic happened during the night. *See* Exhibit B, at 5, 14. Similarly, her posts with her then-boyfriend Paul Jimmison from the following months severely undermine her claims of being confined to her home. Her testimony in her 2018 deposition claimed she was effectively paralyzed:

> I isolate myself. I won't leave the house, I stay in bed. I won't eat. I can't sleep for more than an hour at a time. My nightmares and night terrors are becoming

worse and more frequent. I'm paranoid that he's watching me or somebody that knows him is watching me, now that I'm back in [Florida].

Exhibit A, at 288:9–14. The few Facebook posts Defendant Lee Health was able to salvage, however, showed Goines dating and going places with her friends—including at least one picture of Jimmison gnawing on Goines's ear at the beach while having "[m]ore fun at [F]ort Myers Beach . . . ." Exhibit B, at 1–4; Exhibit C. And if Defendant Lee Health had been given the opportunity, it could have compared Goines's posting history and practices before and after the alleged incident to see whether any apparent changes occurred.

Finally, the bad-faith showing is self-evident. First, Goines's evasiveness with respect to the account during discovery is suspicious, including the outright falsehoods she has made. *E.g.*, Exhibit A, at 267:6–15 (claiming Goines did not use Facebook the night of the purported assault or the following morning). Second, there was the timing of the account's permanent deletion, which was after Defendant Lee Health had affirmatively requested information from it. Third, there is the fact that Goines claims to have never even checked her account or participated in discovery in good faith, along with her open contempt for the discovery process. *See supra* Section IV.B; Exhibit A, at 330:10–331:4; Goines Depo., at 45:19–46:3. Fourth, Goines's claim for why she deleted her Facebook is suspect—she claims she felt unsafe having it but did not explain how changing her privacy settings or simply leaving the account deactivated (as opposed to deleted) could not have resolved that issue.[15] Fifth, and most importantly, the few posts Defendant Lee Health was able to salvage are harmful to Goines's case, as described above, which suggests a motive to delete them. In any event, this case is hardly the first instance of a party spoliating evidence of a social media account; courts around the country have repeatedly issued

---

[15] Additionally, Goines asserts that she maintained her Facebook so she could keep her pictures of her children. But she admitted in her deposition that she never tried to salvage those pictures before deleting the account despite their claimed importance to her. Goines Depo., at 32:2–34:2.

sanctions for deletion of social media accounts.  *See, e.g., Gatto v. United Air Lines, Inc.*, No. 10-cv-01090, 2013 WL 1285285 (D.N.J. Mar. 25, 2013) (imposing adverse jury instructions on a party that wrongfully disabled its Facebook account).

Goines does not have any apparent rebuttal to these points.  She even testified that she chose to delete her Facebook despite allegedly receiving a verbal instruction from her counsel not to delete the account.  As she put it, she deleted the account anyways "[b]ecause I figured it was mine.  It was irrelevant.  I still don't know the relevance of it now."  Goines Depo., at 62:18–63:23.  But what Goines personally did or did not think was relevant does not matter; this motion has already outlined several ways in which her posts were relevant, and a non-lawyer like Goines should not have been making legal determinations regarding relevancy.[16]  Moreover, this claim by Goines is particularly disagreeable considering there was at least one post that was obviously responsive to the particular language of Defendant Lee Health's outstanding request for production that anyone would have reasonably known was responsive.  Further, Goines admittedly did not even bother checking her Facebook to determine if any of these posts were actually responsive.  *See* Exhibit G, at 4 (requesting any posts referencing Defendant Lee Health or Goines's "hospitalization with Defendant Lee Health"); Exhibit B, at 5, 13 (using Facebook's check-in feature to inform Goines's friends she was at Cape Coral Hospital).  In short, parties should not be able to avoid their obligations to preserve evidence by simply putting on blinders, failing to check the relevant documents, and later claiming they did not understand the relevance of those documents.

---

[16]   If Goines truly believed the posts were not relevant, she should have raised that objection in her written discovery responses, at which point Defendant Lee Health would have conferred with her counsel and explained the relevance per Local Rule 3.01(g) and Federal Rule of Civil Procedure 37.

### 2. Appropriate sanctions include Defendant Lee Health's fees and costs in addition to adverse spoliation instructions.

As Defendant Lee Health can demonstrate the elements of spoliation, this Court has broad discretion under its inherent authority to determine appropriate sanctions. *See generally Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 943–44 (11th Cir. 2005). Past cases have explained the various types of sanctions a court can impose in these situations. One case from the District of New Jersey is particularly helpful. In *Mosaid Tech. Inc. v. Samsung Elecs. Co., Ltd.*, 348 F. Supp. 2d 332 (D.N.J. 2004), the court explained that "[p]otential sanctions for spoliation include: dismissal of a claim or granting judgment in favor of a prejudiced party; suppression of evidence; an adverse inference, referred to as the spoliation inference; fines; and attorneys' fees and costs." *Id.* at 335. The court further explained that authority to issue these types of sanctions arose from both its own inherent authority as a court *and* from the powers vested in it through the Federal Rules of Civil Procedure. *Id.*

Ultimately, any spoliation sanctions must derive from the purpose of the spoliation doctrine, which is "to prevent unfair prejudice to litigants and ensure the integrity of the judicial process." *Se. Mech. Servs., Inc. v. Brody*, 657 F. Supp. 2d 1293, 1302 (M.D. Fla. 2009) (quoting *Flury v. Daimler Chrysler Corp.*, 427 F.3d 939, 944 (11th Cir. 2005)). In its *Swofford v. Eslinger* decision, this District explained three factors to consider when crafting sanctions: (1) willfulness or bad faith of the spoliating party, (2) the amount of prejudice caused to the non-spoliating party, and (3) the ability to cure the prejudice through sanctions. 671 F. Supp. 2d 1274, 1280 (M.D. Fla. 2009). The net result of these types of decisions is that a sanction for spoliation of evidence must consider the remedial effects on the current litigants, the deterrent effects regarding spoliation by future litigants, and public perceptions of the judicial system's integrity. *See Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 590 (4th Cir. 2001); *see also West v. Goodyear Tire & Rubber Co.*,

167 F.3d 776, 779 (2d Cir. 1999) ("The sanction should be designed to: [1] deter parties from engaging in spoliation; [2] place the risk of an erroneous judgment on the party who wrongfully created the risk; and [3] restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.").

To that end, two types of sanctions would remedy the harm caused by Goines's spoliation of the account.  First, as outlined above, Defendant Lee Health is seeking to recoup the fees and expenses it incurred in pursuing this motion and the spoliation issue generally.  This sidetrack to this litigation was wholly unnecessary, and Defendant Lee Health has been forced to incur considerable expenses in its attempts to overcome the harm caused by Goines.  As described before, these expenses include the preparation of this motion, the preparation of the original and first amended spoliation motions, all discovery over the past few months, the deposition of Todd Patrick, letters and other communications with opposing counsel, legal research, and time spent deposing Goines on the existence of her Facebook account that could have been spent on other matters.

But recoupment of Defendant Lee Health's expenses is insufficient.  Even if Defendant Lee Health recovers everything it spent on this needless litigation detour, the relevant evidence in the Facebook account would still be deleted forever.  And although Goines might argue that Defendant Lee Health already possesses certain authentic screenshots from her account, the fact stands that Defendant Lee Health was denied the opportunity to inspect the entire account (that Goines frequently used), and will never be able to view her other posts to determine whether they were relevant to her mental state or her claims.  Therefore, the following jury instructions are appropriate:

1. On July 16, Goines posted the "comon [sic] sense" picture (Exhibit B, at 7) after 10:00 p.m. (the first alleged assault), given that nobody can now determine the actual time it was posted.

2. Goines's early-morning posts from July 17 show she was active on Facebook during that night.

3. Goines was the person who "liked" Tameeka Gibson's 3:37 a.m. comment on her "Lez Get Erotic" post (*id.* at 12), and she liked it shortly after Gibson posted it.

4. Goines did not use Facebook to contact abused women as part of a support group, and she did not contact anybody from such a group in the immediate aftermath of her purported attack, considering that Defendant Lee Health cannot verify that any of these groups or people existed. *See* Exhibit A, at 267:19–268:23.

5. Goines's other posts—the ones Defendant Lee Health does not currently possess—would have showed her living a normal life with her friends and family, similar to the ones Defendant Lee Health actually has, contrary to Goines's claim that she is unable to leave her house or engage in any normal social activities. *See generally* Exhibit B, at 1–4; Exhibit C.

These instructions cannot wholly undo the harm caused by Goines, but they at least begin to ameliorate the prejudice resulting from Goines's spoliation of her Facebook.

## V.   LOCAL RULE 3.01(g) CERTIFICATION

The undersigned certifies that she has had numerous discussions with Goines's counsel, both in writing and via telephone, regarding Goines's Facebook records and Goines does not agree to the assessment of sanctions. Most recently, the undersigned spoke via phone on June 12, 2019, with the attorney representing Goines's counsel regarding filing of an amended motion for sanctions, as permitted by the Court's order. The undersigned also spoke with Hechavarria, and he does not oppose this motion.

## VI.   CONCLUSION

Despite Defendant Lee Health's discovery requests, Goines never produced anything from Facebook, and that account now has been deleted forever. Actions like this undermine the integrity

24

of the legal system, force parties and the public to absorb the costs of needless litigation, and deprive parties of their due process rights to defend themselves from serious accusations. The evidence in this case clearly demonstrates at a minimum an utter lack of regard for the discovery process and the duty to preserve evidence. Therefore, Defendant Lee Health requests adverse spoliation instructions and monetary sanctions against Goines and her counsel.

Respectfully submitted,

/s/ *Angelique Groza Lyons*
Angelique Groza Lyons, Esq., Fla. Bar No. 118801
alyons@constangy.com
CONSTANGY, BROOKS, SMITH &
PROPHETE, LLP
100 North Tampa Street, Suite 3350
Post Office Box 1840
Tampa, Florida 33601-1840
(813) 223-7166 / Fax: (813) 223-2515

Mark A. Haskins, Esq., Fla. Bar No. 881627
mark@markhaskinspa.com
MARK A. HASKINS, P.A.
2801 Fruitville Road, Suite 230
Sarasota, Florida 34237-5365
(941) 281-4000 / Fax: (941) 281-4001

**Attorneys for Defendant Lee Health**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of June 2019, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF System, which will send an electronic notice of filing to, or was otherwise served via email on, the following:

Ryan A. Fogg, Esq.
David J. Halberg, Esq.
DAVID J. HALBERG, P.A.
1615 Forum Place, Ste. 3-B
West Palm Beach, FL 33401
Service@HalbergLaw.com

Jeovanni H. Hechavarria, R.N.
5320 Summerlin Rd., Unit 9
Ft. Myers, FL 33919
JHHechavarria@gmail.com

5862460v.1

/s/Angelique Groza Lyons
Attorney

26